# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

| | | |
|---|---|---|
| ANTONIO LAMONT MURRAY, | ) | |
| | ) | |
| Movant, | ) | |
| v. | ) | Case No. CV614-128 |
| | ) | CR612-005 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

Convicted by a jury of conspiracy to kidnap, two counts of kidnapping, three of using a firearm during the conspiracy, one count of obstruction of justice (doc. 133), and sentenced to "life plus 684 months [in prison], to be served consecutively" (doc. 149 at 3), Antonio Murray moves *pro se* for 28 U.S.C. § 2255 relief. Doc. 197.[1] The government opposes. Doc. 209.

## I.    BACKGROUND

At 10:00 p.m. on December 1, 2011, two masked men broke down Timothy Marshlick's bedroom door, jumped on top of him in his bed, and pointed guns at him. Doc. 159 at 204-05. They wanted money and

---

[1]   All citations are to the criminal docket unless otherwise noted; all page numbers are those imprinted by the Court's docketing software.

demanded to know where Marshlick kept his safe. *Id.* at 207-08. He had no safe but told the intruders that he had cash at his office in Pooler, Georgia. *Id.* at 211.

After stealing a number of items from his house, the men threw Marshlick into the back seat of his truck (but not after beating him for trying to run away) and left for his office. *Id.* at 211-12. Once there, Marshlick convinced his kidnappers that a silent alarm would trigger if they entered the office. *Id.* at 213-14. So, back to Marshlick's house they went. *Id.* at 214.

After searching for the non-existent safe again, the kidnappers decided to return to the office despite Marshlick's earlier warning. *Id.* at 215. He again reminded them of the police threat but offered to obtain money in the morning if they let him live. *Id.* The kidnappers approved of the plan and held Marshlick overnight in a rundown house. *Id.* at 218-19.

The next morning, Marshlick called his business manager, Shannon Rahn, and directed him to cash two $9,500 checks to pay for the ransom. *Id.* at 220. After Rahn did that, the kidnapper Marshlick dubbed "Bob" called Rahn and, in a series of recorded calls (Rahn had

already contacted the FBI), directed him where to drop the ransom money. *Id.* at 77-137. On the way to the drop, Rahn noticed a burgundy car shadowing his every move. *Id.* at 148-49. That car later stopped -- and a man emerged and appeared to look for something at the spot Rahn dropped the money. *Id.* at 128.

Little more than a month later, on January 12, 2012, Billy Downs also endured a very unpleasant evening. Three masked, armed, men accosted him outside his back door. *Id.* at 322. They demanded $250,000 and proceeded to ransack Downs' house. *Id.* at 323-25. When Downs' wife, Carolyn, arrived home, the men threatened to abduct her if Downs didn't produce the money. *Id.* at 329.

Instead, at Downs' suggestion, two of the men took Downs while a third man stayed with Carolyn, who was now tasked with obtaining the ransom, at the house. That third kidnapper, apparently hungry and thirsty, looked all through the kitchen for food and drink, eventually settling on a can of Mountain Dew, which he drank and then left in the sink. *Id.* at 310-11; doc. 160 at 33.

The next morning, Carolyn received a call from one of the kidnappers, who told her to head to the bank. Doc. 159 at 287-88. She

did, and eventually obtained the $250,000 in cash from several different banks. *Id.* at 289-93, 295-300. At the kidnappers' direction, she dropped some of the money in a ditch, and the rest in a dirt parking lot. *Id.* at 295-96, 300-01.

The kidnappers then released Downs, who promptly led the FBI to the trailer where the kidnappers held him (he grew up in the area and knew the turns the kidnappers took even though blindfolded). Doc. 160 at 355-56. A search there revealed various items from both Marshlick's and Downs' houses, as well as kidnapping paraphernalia (duct tape, gloves, etc.) and money wrappers from one of the banks that provided Rahn the Marshlick ransom money. Doc. 159 at 195-200. The trailer's owner, Gary McDonald, immediately cooperated with the FBI and told agents that Murray and a third man, Cecil Nelson, were involved in the Marshlick and Downs kidnappings. Doc. 160 at 526.

A search of Murray's apartment revealed a "huge" flat screen TV, an empty box for another TV, two pairs of high end sunglasses, eight cell phones, receipts for other cash purchases,[2] and $1,800 cash found on

---

[2] In early January 2012, Murray paid an auto body shop $17,000 cash to paint and make custom modifications to a Chevrolet Monte Carlo. Doc. 160 at 576-78. He spent $3,000 cash on January 15, 2012 to buy another car. *Id.* at 569. He bought

Murray. *Id.* at 398-402, 414-15. A short distance from the apartment, investigators found in a dumpster flower arrangements, sculptures, candle holders, vases, and other items taken from Marshlick's home. *Id.* at 454-58. Murray's cars -- one of which was newly painted silver to cover a previous burgundy paint job, *id.* at 404-06 -- contained gloves and a mask with eyeholes cut out, both consistent with items worn by the kidnappers. *Id.* at 409-11.

Nelson and McDonald, Murray's co-kidnappers, both reached plea deals with the government. Murray chose to go to trial, where McDonald testified against him. Also arrayed against him were cellular telephone records that detailed where his phone was during the Marshlick and Downs kidnappings, voice identification witnesses who testified that the voice of "Bob" on recordings was Murray's, and DNA evidence from the Mountain Dew can in the Downs' home (Murray's own testimony -- over the advice of counsel to remain silent -- likely did not help either). Faced with that evidentiary mountain, the jury convicted Murray on all charges. Doc. 133.

---

tires and rims ($875), *id.* at 574-75, paid old speeding tickets ($510), *id.* at 589, and managed to pay $720 towards delinquent child support obligations. *Id.* at 572.

On direct appeal, Murray asserted that (1) counsel provided ineffective assistance because the magistrate judge refused to approve money for a defense DNA expert, and (2) his inability to question the state biologists who analyzed the Mountain Dew can violated the Confrontation Clause. *See Murray*, 540 F. App'x at 920. The court of appeals rejected both claims. *Id.* This § 2255 motion followed. Doc. 197.

## II. ANALYSIS

### A. Ineffective Assistance of Counsel (IAC)

Murray's first eight claims all surround the ineffective assistance his attorney, Bobby Phillips, allegedly provided. *See* doc. 198 at 4-15. He must show "that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant." *Hollis v. Sec'y, Fla. Dep't of Corr.*, 2015 WL 5847258 at * 1 (11th Cir. Oct. 8, 2015) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "[P]erformance is deficient when it falls below an objective standard of reasonableness" and is "outside the wide range of professionally competent assistance." *Id.* And prejudice occurs if "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

### 1. Failure to Investigate Mark Crowe's Testimony

Murray first claims that Phillips failed to investigate the impeachment testimony of Pooler, Georgia Chief of Police Mark Crowe, a long-time acquaintance of Murray's who recognized his voice on recorded calls. Doc. 198 at 4. He contends that Phillips knew Crowe was seven years older than Murray and therefore graduated high school before Murray attended. Also, Crowe was Carolyn Downs' student. *Id.* Phillips, Murray argues, should have used that knowledge to impeach Crowe. *Id.*

In fact, Phillips cross-examined Crowe and highlighted that Crowe and Murray attended high school at different times, ostensibly to show the jury Crowe's unfamiliarity with Murray's voice. *See* doc. 159 at 162-63. He also teased out that Crowe had never spoken to Murray on the phone, *id.* at 163, and only occasionally interacted with Murray. *Id.* at 164. Although Phillips never questioned Crowe about his time in Carolyn Downs' class (Murray believes that bringing this fact out would show Crowe's bias, or something), the Court cannot second guess that

decision because it was "arguably dictated by a reasonable trial strategy," in this case minimizing the jury's exposure to Downs, a sympathetic victim. *See King v. United States*, 2009 WL 2900273 at * 3 (S.D. Ga. Aug. 17, 2009); *see also Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (""In order to show that an attorney's strategic choice was unreasonable, a petitioner must establish that no competent counsel would have made such a choice."). Put differently, Phillips performed competently in his cross-examination of Crowe and Murray's claim thus fails.

## 2. Failure to Challenge Cell Phone Chain of Custody

Cell phones seized from Murray provided the jurisdictional "hook" that landed him in federal court,[3] and they also provided key geolocation and voice evidence considered by the jury. Murray argues that Phillips should have challenged the chain of custody of those phones, particularly since they were, says Murray, stolen and tampered with while in police custody. *See* doc. 198 at 5-6. He also attacks Phillips' failure to call the

---

[3] *See* 18 U.S.C. § 1201(a)(1) (prohibiting kidnapping and holding for ransom any person when "the offender . . . uses . . . [an] instrumentality of interstate . . . commerce in committing or in furtherance of the commission of the offense"); *United States v. Evans*, 476 F.3d 1176, 1180 (11th Cir. 2007) ("[C]ellular telephones are instrumentalities of interstate commerce . . . even without evidence that the calls . . . made were routed through an interstate system. . . .").

phones to see if they rang, and claims the government lied when it represented that one phone, trial exhibit 127A, came from Murray. *Id.* at 5. Murray's phones, the government contends, suffered no chain-of-custody issues, so Phillips had no meritorious issue to argue. Doc. 209 at 25.

To begin, Murray is simply wrong that the phones which provided substantial incriminating evidence against him were seized from Cecil Nelson's truck and later stolen while in law enforcement custody. Certainly *some* phones seized from the truck were later stolen. *See* doc. 198 at 19-20 (FBI form 302 describing the theft of two phones from Nelson's truck by an employee of the towing company that moved the truck on January 22, 2012). But as Special Agent Ozden's trial testimony made clear, Murray's phones, Exhibits 125A and 127A, were seized from Murray's apartment during a lawful, warranted search.[4] *See* doc. 160 at 78. Arguing *ipse dixit* to the contrary in a § 2255 motion does not change that.

Nor was Phillips ineffective for not dialing the phone numbers attributed to Murray to see if the phones introduced in evidence actually

---

[4] Murray's claim that the government lied about the origins of Exhibit 127A (*see* doc. 198 at 5) fails because of this same evidence.

rang.  FBI analyst Charles McStotts investigated the phones pursuant to a search warrant and testified that the numbers corresponded to Exhibits 125A and 127A respectively.  *See* doc. 160 at 93-96.  Murray's conclusory assertions to the opposite effect once again cannot undermine the plain import of unrebutted trial testimony.  His phone-based IAC claims are frivolous, and because a failure to raise non-meritorious arguments cannot prejudice § 2255 movants, *see United States v. Winfield*, 960 F.2d 970, 974 (1992) ("[A] failure to preserve a meritless issue plainly cannot prejudice a client."), they perish.

### 3. Phillip's Failure to Secure an Independent DNA Expert

Murray next argues that Phillips provided constitutionally defective assistance by not hiring an independent expert to analyze the DNA obtained from the Mountain Dew can in the Downs' kitchen sink. Doc. 198 at 6-8.  Had Phillips done that, Murray contends, "it would be shown that the amount of sample material was too small to obtain a reliable profile and that the 1 in 6500 random probability match was meaningless in a criminal trial."  *Id.* at 8.

A decision not to call an expert witness is, in and of itself, "not so patently unreasonable a strategic decision that no competent attorney

would have chosen this strategy." *Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001). A § 2255 movant still must show that, under the circumstances, no reasonable counsel would have chosen to forego an expert, *and* must show that but for the decision, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687.

Murray has not, and cannot, make that showing. As Phillips acknowledged in his opening statement, doc. 159 at 40, the Mountain Dew can only contained a tiny amount of DNA to begin with, and the FBI's analysis consumed it all. *See also* doc. 160 at 160 (FBI DNA expert testified that the can contained "a very, very small amount of DNA"); *id.* at 166 (DNA sample "was so small that" there wasn't "much extract left over"). Had Phillips hired an expert, he or she could only have analyzed the data produced by the FBI, not actual DNA.

In light of that, Phillips decided to forego an expert and instead attack the government's DNA evidence via cross-examination. He elicited from the government's expert that 0.5 nanograms of DNA are needed to obtain a "full DNA profile," but that only 0.19 nanograms came from the Mountain Dew can (0.38 nanograms after replication in a lab). *See id.* at 161. Throughout trial, he argued the unreliability of

such a small sample, *see id.*; doc. 159 at 40, and highlighted the large match probability difference between the sample attributed to Murray (1 in 6,500) and that from a full-size DNA sample (1 in several trillion). Doc. 159 at 40; doc. 161 at 692-93. Phillips in fact pointed out that the DNA sample obtained would match at least eight people in Bulloch and Bryan counties. Doc. 161 at 693.

Despite Murray's belief that his success at trial depended on the presence of a second DNA expert,

> *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.
>
> In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict. And while in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy. Here [Murray]'s attorney represented him with vigor and conducted a skillful cross-examination. As noted, defense counsel elicited concessions from the State's expert[] and was able to draw attention to weaknesses in [her] conclusions. . . .

*Harrington v. Richter*, 562 U.S. 86, 111 (2011); *see also Jackson v. McQuiggin*, 553 F. App'x 575, 580-82 (6th Cir. 2014) (counsel reasonably

decided not to hire an arson expert and instead cross-examine the state's expert because forensic evidence contradicted his conclusions); *United States v. Smallwood*, 2015 WL 94155 at * 2 (W.D. Ky. Jan. 7, 2015) (same); *Bradley v. Thaler*, 2011 WL 8108274 at * 5 (N.D. Tex. Dec. 7, 2011) ("[C]ounsel's decision not to hire a defense expert in accident reconstruction and instead conduct a vigorous cross-examination of the state's expert was not unreasonable."). Because (1) the lack of DNA precluded a fresh analysis, and (2) questioning the government's expert remained a viable defense technique, Phillips' decision to counter the government's DNA evidence through cross-examination instead of a redundant expert constituted a reasonable trial strategy.

Even if the Court assumes Phillips performed deficiently, Murray makes no showing that not hiring an expert caused him any prejudice. A co-conspirator testified that Murray participated in the Downs kidnapping;[5] a mask found in Murray's car matched those worn by the Downs kidnappers; Murray spent a large sum of cash the month after the Downs kidnapping; and the "overwhelming evidence [showed] that Murray had been involved just a month earlier in a materially identical

---

[5] As the government correctly notes, the DNA on the Mountain Dew can only spoke to Murray's presence at the Downs kidnapping, not Marshlick's. Doc. 209 at 28.

crime." Doc. 209 at 28 n. 7. That mountain alone, without considering DNA evidence tying Murray to the Downs' house, easily supports the guilty verdict the jury reached. Hence, Murray cannot show a reasonable probability exists that, but for the absence of a DNA expert, his trial would have ended differently. Having suffered no prejudice from counsel's otherwise competent performance, Murray's DNA-expert IAC claim fails.

### 4. Failure to Appeal Magistrate Judge Orders

In addition to criticizing Phillips' decision not to hire a DNA expert, Murray lambasts him for not appealing the undersigned's denial of his motion for DNA and voice identification experts. Doc. 198 at 8-9. Those failures to appeal, Murray contends, allowed the government's DNA expert to go "virtually unchallenged," *id.* at 9, and prevented him from showing that the recorded voice of "Bob" did not match Murray's. *Id.*

As discussed above, not having a DNA expert caused Murray no prejudice. Regardless of whether Phillips should have objected to the undersigned's denial, then, Murray's IAC claim fails. *See Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable,

does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

So too does his voice identification-expert argument.

Unlike scientific, medical, and even handwriting analysis, 'voice identification is not generally considered to be an area where expertise is important.' *United States v. Cambindo Valencia*, 609 F.2d 603, 640 (2d Cir. 1979) (citing Fed. R. Evid. 901(b)(5)). Indeed, juries themselves often make voice comparisons with authenticated specimens without the help of expert testimony. *See United States v. Fearon–Hales*, 224 F. App'x 109, 112 (2d Cir. 2007) ("[T]he jury is generally competent to compare voice recordings with authenticated specimens, and no expert witness is required."); *Tyson v. Keane*, 159 F.3d 732, 738 (2d Cir. 1998) ("[A] jury cannot discern whether a fingerprint from the scene matches defendant's prints without expert assistance. Voice identification, however, does not depend on specialized expertise. Juries may listen to an audiotape of a voice and determine who is speaking even though the voice has been authenticated only by a lay witness rather than an expert."); *United States v. Sliker*, 751 F.2d 477, 500 (2d Cir. 1984) ("We thus see no reason in principle why, in a case like this, where the person whose voice on a tape is to be identified has testified, the jury cannot itself make the comparison."). Likewise, lay witnesses can compare voices and make identifications, and the jury can decide whether to believe such witnesses. *See United States v. Rizzo*, 492 F.2d 443, 448 (2d Cir.1974). Attacking the credibility of such lay witness testimony on cross-examination is well within reasonable trial strategy. *See Samet v. United States*, 559 F. App'x 47, 50 (2d Cir. 2014) (failure to call or consult expert handwriting and voice identification witnesses was not ineffective because trial counsel reasonably "elected to undermine the government's witnesses through cross-examination rather than through rebuttal experts").

*Marte v. United States*, 2015 WL 4094187 at * 2 (D. Conn. July 7, 2015).

That's what Phillips reasonably chose to do here -- he attacked the credibility of the three lay voice identification witnesses who identified Murray as the speaker on various FBI recordings of the kidnappers. *See, e.g.*, doc. 159-64 (drawing attention to facts suggesting that Crowe, despite his acquaintance level association with Murray over twenty-five years, might not be able to recognize his voice on a recording). Jurors, acting within their competency as laypeople, then weighed the cross-examined testimony against their own comparison of the recordings and Murray's voice (recall that he testified in his own defense, doc. 160 at 275-322). *See Marte*, 2015 WL 4094187 at * 2. That they subsequently concluded the recordings reflected Murray's voice does not reflect unreasonable trial strategy; rather, it shows that the jury weighed the evidence and found Murray's lacking. An IAC claim premised on that, in the face of counsel who engaged in spirited cross-examination of the government's witnesses, cannot prevail.

### 5. Failure to Object to Hearsay Testimony

Murray next complains that Phillips failed to raise a Confrontation Clause objection to alleged hearsay testimony from Dr. Charity Davis, the government's DNA expert. Doc. 198 at 9. That failure, Murray

contends, resulted in "[t]he Appeals Court den[ying] the appeal issue because . . . it was not preserved at trail [sp]." *Id.* Not so. The court of appeals directly addressed the issue and held that "Davis's testimony did not violate the Confrontation Clause" and thus caused no "error, plain or otherwise."[6] *Murray*, 540 F. App'x at 921. Whether or not Phillips performed deficiently in failing to assert Murray's confrontation rights, "no error" means no prejudice and Murray's IAC claim thus fails.

### 6. Failure to Challenge Voice Identification Testimony

Murray's sixth IAC claim faults Phillips for allegedly not challenging Lakeena Grant's testimony identifying Murray's voice on FBI recordings of the Marshlick kidnapping. Doc. 198 at 11. But Phillips *did* challenge Grant's testimony. Under his cross-examination, she revealed that she only worked with Murray for three months, for less than four days per week, and only for short periods of time. Doc. 159 at 264-68. She also testified that she never spoke to Murray on the phone or heard a recording of his voice. *Id.* at 264. Phillips, too, probed the

---

[6] Murray also argues that the Eleventh Circuit declined to consider this issue because Phillips failed to preserve it. Doc. 198 at 11. That's just not the case. Expressly addressing the constitutional implications of Davis' testimony, the court ruled that it simply "did not violate the Confrontation Clause." *Murray*, 540 F. App'x at 921.

FBI's questioning of Grant to illuminate potential "suggestive police action" (doc. 198 at 12) that might have undermined her identification of Murray. Doc. 159 at 266-68. What more Phillips could have done to "challenge" Grant's testimony is unclear (Murray offers no details) and in any case irrelevant since his conduct fell within, not outside, "the wide range of professionally competent assistance." *Hollis*, 2015 WL 5847258 at * 1.

### 7. Failure to Investigate Exculpatory Voice Evidence

Murray's seventh IAC claim sees deficiency in Phillips decision not to call Tammie Lawson, one of Murray's co-workers, to testify that the recorded voice of "Bob" was not Murray's. Doc. 198 at 15. Phillips, he says, knew that Lawson told the FBI that Bob's voice did not match Murray's, yet declined to present her testimony at trial. *Id.*

Even if Phillips acted precisely as Murray alleges, Murray fails to show how that conduct caused him prejudice. *See Hollis*, 2015 WL 5847258 at * 1 (habeas petitioners bear the burden of showing prejudice). Indeed, he alleges nothing that relates to the impact Lawson's testimony would have had on the trial, much less anything to suggest "the result of

the proceeding would have been different" had she testified.[7]  *Id.*

Because Murray had to "carry his burden on both *Strickland* prongs to

demonstrate ineffective assistance of counsel," *id.* his claim fails.  *See*

*also Topete v. United States*, No. 14-14703, *slip op.* at 3 (11th Cir. Oct. 19,

2015) ("[A] court need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the defendant as a

result of the alleged deficiencies.").

### 8.    Failure to Renew Hearsay Objection

In his final IAC claim, Murray contends that Phillips should have

renewed his hearsay objection to testimony by FBI Special Agent Klarer

"regarding what was told him by Queen Murray," and should have raised

the issue on appeal.[8]  Doc. 198 at 14-15.  He further argues that his

---

[7]  Even if the jury fully credited Murray's hypothetical Lawson testimony, and in doing so fully discredited the other positive voice identification witnesses, Murray cannot show prejudice.  The remaining evidence against him -- his DNA at the scene of the Downs' kidnapping; co-conspirator testimony tying him to both kidnappings; multiple large cash purchases by an otherwise destitute Murray in the month after the Downs kidnapping; the presence of Marshlick's house decorations in a dumpster near Murray's apartment; Murray's car matching the car that picked up the Marshlick ransom money; the mask and gloves in Murray's car that matched the kidnappers'; and geolocation evidence tying Murray's phone to the Marshlick kidnapping -- allows for little to no possibility that the result of trial would have changed at all had Lawson testified.

[8]  Klarer testified that Queen Murray told him that Murray directed her to dispose of certain items in a dumpster some distance from the Murray apartment.  Doc. 160 at 114.  Phillips objected on hearsay grounds, *id.*, but the Court overruled him, finding

testimony violated the "spousal privilege," and that Phillips should have objected on that basis too. *Id.* at 15.

Once again, Murray cannot show prejudice from counsel's conduct. Phillips objected once to Klarer's testimony. Doc. 160 at 114. That testimony continued over his objection, but never strayed beyond the Court's evidentiary ruling (that the government confine its questioning to *why* Klarer searched a dumpster miles from Murray's apartment). Murray gives no reason why (1) a second objection parroting the first would have had any chance of success (much less a reasonable probability, *see Strickland*, 466 U.S. 668, 687 (1984)), or (2) the court of appeals would have reversed the district judge and Murray's conviction for the Marshlick kidnapping if it excluded the dumpster evidence. Because Murray's spousal privilege argument also lacks merit,[9] his claim does too.

---

that the testimony explained why Klarer went to the dumpster and was not offered for the truth of the matter asserted. *Id.* at 115.

[9] The "spousal" or "marital" privileges, both under Georgia and federal law, (1) allow one spouse to refuse to testify against the other, *see* O.C.G.A. § 24-5-503(a) ("A husband and wife shall be competent but shall not be compellable to give evidence in any criminal proceeding for or against each other."); *United States v. Abram*, 2006 WL 690850 at * 4 (11th Cir. Mar. 20, 2006) (marital testimony privilege may be asserted by the witness spouse only), or (2) prohibit as evidence at trial communications between husband and wife. O.C.G.A. § 24-5-501(a)(1); *Abram*, 2006 WL 690850 at * 4. Queen Murray never testified against her husband (though, she

### 9. Throwaway IAC Claims

In his "summary of the argument," Murray includes several additional IAC claims found nowhere else: that Phillips (1) waived his speedy trial rights "on the pretense of devising a defense strategy, but failed to reveal any strategy at trial;" (2) presented no witnesses or evidence except "that which was obtained by Murray from inside jail;" (3) "gave no meaningful challenge to any of the government's . . . evidence;" and (4) failed to object or appeal key issues. Doc. 198 at 3. All of those claims see no support elsewhere in Murray's briefing. Standing alone, they lack any factual support and are simply conclusory assertions that can't satisfy Murray's burden to show deficient performance and prejudice. *See Strickland*, 466 U.S. at 687; *Lynn v. United States*, 365 F.3d 1225, 1239 (11th Cir. 2004) (conclusory allegations do not warrant an evidentiary hearing).

### B. *Brady* Violations

For his first non-IAC claim, Murray alleges that "[t]he prosecution['s] fail[ure] to divulge" two "exculpatory voice identification

---

could have waived the privilege if she so desired, *see Abram*, 2006 WL 690850 at * 4), nor were her communications with him introduced as evidence.

witnesses" (doc. 198 at 15-16), and Carolyn Downs' teacher-student relationship with Mark Crowe (*id.* at 4-5) violated due process. *See Brady v. Maryland*, 373 U.S. 83 (1963).[10] In addition to pointing out Murray's procedural default of these claims, the government cites uncontroverted evidence that it disclosed both witnesses to Murray's counsel, while Murray himself already knew of the Downs-Crowe relationship. *See* doc. 198 at 4-5. Both arguments persuade, and both dispose of this claim.

---

[10] *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

> To establish a *Brady* violation, a petitioner must show that: (1) the prosecution possessed evidence favorable to the accused, because it was either exculpatory or impeaching, and did not disclose it to the defense; (2) the State suppressed the evidence such that the defense did not otherwise possess the evidence and could not reasonably have obtained it; and (3) the evidence was material, and its absence yielded prejudice. *See, e.g., Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1354 (11th Cir. 2004); *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Evidence is material so as to establish prejudice only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

*Gary v. Hall*, 558 F.3d 1229, 1255 (11th Cir. 2009).

## 1.  Procedural Default

Murray never raised his *Brady* claims on direct appeal.  *See Murray*, 540 F. App'x 918.  And, "[a] § 2255 motion, it must be remembered, may not be used as a 'surrogate' for a missed direct appeal." *Jones v. United States*, 2015 WL 464243 at * 1 (S.D. Ga. Jan. 28, 2015) (citing *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004)); *see Stone v. Powell*, 428 U.S. 465, 478 n. 10 (1976) (28 U.S.C. § 2255 will not be allowed to do service for an appeal).  "Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." *McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011).

A procedural default may be overcome if the movant can show "cause excusing his failure to raise the issue previously and prejudice from the alleged error." *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000).  Ineffective assistance of counsel (IAC) can constitute cause. *Id.*  Although Murray asserts at least eight separate IAC claims,

none relate to Phillips' "failure" to raise *Brady* claims on appeal.[11] They therefore cannot serve as cause for his default, which accordingly bars his *Brady* claims. *Id.* at 1344 (IAC "may satisfy the cause exception to a procedural bar," but only if the arguments counsel failed to raise would "have affected the outcome of [the] appeal").

## 2. *Brady* Claim -- The Merits

Even if Murray's *Brady* claims weren't barred by a procedural default, they nevertheless suffer from a complete lack of merit. The voice identification witnesses Murray says the government never disclosed were in fact disclosed. *See* doc. 209-3 (email exchange between Phillips and Assistance United States Attorney Brian Rafferty detailing who at Wolf Management (Murray's employer) identified Murray's voice and who did not); doc. 209-4 (FBI 302 report of interview with Tammy Lawson, the witness Murray highlights as a person who thought the recorded voice of "Bob" was not Murray). And the Carolyn Downs-

---

[11] Murray, amongst a raft of allegations aimed at Phillips' alleged failure to investigate, states in his first IAC claim that the government failed to make "known to the defense as *Brady* material" that Carolyn Downs taught Crowe. Doc. 198 at 5. To the extent that states a *Brady* claim, it could, if meritorious, serve as cause for procedural default. As discussed above, however, the claim has no merit whatsoever since (1) Murray himself knew Downs taught Crowe, and (2) Phillips performed competently in attacking the government's voice identification witnesses, Crowe included.

Crowe relationship never qualified as *Brady* material because (1) Murray knew Downs taught Crowe, *see Gray*, 558 F.3d at 1255 (second element of *Brady* claim requires government suppression of evidence "such that the defense did not otherwise possess"), and (2) Murray fails to allege anything suggesting that the relationship was material and that its "absence yielded prejudice."[12]  *Id.*  Having been procedurally defaulted and lacking all merit, his *Brady* claims fail.

## C.    Denial of Motion to Retain a DNA Expert

In his final claim, Murray argues that "[t]he Court abused its discretion in denying Murray's motion for expenditure to hire DNA expert witness." Doc. 198 at 17.  The court of appeals already passed on, and rejected, that argument,[13] so this court "is not required to consider [it]" in a § 2255 proceeding. *Nyhuis*, 211 F.3d 1340, 1343.  Even if they

---

[12]    Murray only alleges that "[h]ad defense counsel properly investigated the information provided him by Defendant, Crowe's testimony and voice identification would be shown to be false and his personal connection to the case revealed." Doc. 198 at 5.  Maybe.  But just as likely -- to say nothing of reasonably probable -- was the jury deciding that Downs teaching Crowe mattered not at all.  At best, the jury could have agreed with Murray that Crowe's testimony was tainted.  But that leaves two other voice identification witnesses who testified that "Bob" was Murray, not to mention the raft of other evidence tying him to the Marshlick kidnapping (recall also that the voice identification evidence served only to link Murray to the Marshlick crime, not the Downs episode).

[13]    *See Murray*, 540 F. App'x at 920 (rejecting claim because Murray never appealed the undersigned's denial of expert funds).

hadn't, Murray never appealed the undersigned's funds denial[14] and so "waive[d his] right to review."  Fed. R. Crim. P. 59(a).

## III.  CONCLUSION

Murray's § 2255 motion (doc. 197) should be **DENIED**.  Moreover, pursuant to Rule 11 of the Rules Governing § 2255 Proceedings,[15] and applying the Certificate of Appealability ("COA") standards set forth in *Brown v. United States*, 2009 WL 307872 at * 1–2 (S.D. Ga. Feb. 9, 2009), the Court discerns no COA-worthy issues at this stage of the litigation, so no COA should issue.  28 U.S.C. § 2253(c)(1).  And, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith.  Thus, in forma pauperis status on appeal should likewise be **DENIED**.  28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED**, this _12th_ day of November, 2015.

UNITED STATES MAGISTRATE JUDGE
**SOUTHERN DISTRICT OF GEORGIA**

---

[14]  As noted above, Phillips performed competently in deciding not to appeal that decision. Even if he hadn't, the failure to appeal caused Murray no prejudice because Phillips thoroughly attacked the DNA evidence via cross-examination.

[15]  Under Rule 11(a), "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant."